Judge, I have raised two issues here. One is that the United States v. Euripides Caguana is the conviction failed as a matter of law, where the government failed to meet its burden of proof that something of value was offered in exchange for the attempted murder-for-hire plot. And the second issue is a issue of sentencing, where I believe that by virtue of the enhancement given for something of pecuniary value is an enhancement that's already covered in the statute itself, which requires that something of a pecuniary value be given. So let's start off with the issue underlying both, and that is what was given in exchange. Here there was allegedly $500 given in exchange not for the murder-for-hire, but for purportedly a purchase of a handgun. And that exchange was between my client, the defendant, and a government informant acting in the capacity of a government informant at the very time that the exchange occurred. This exchange was for $500 purportedly for the purchase of a gun. But there was a promise to pay $7,500. Well, there was. And all the statute requires is a promise. That promise, Judge, if you look at the transcripts of what was said, that was a promise that was concocted wholly by the government informant who said, yes, you're going to pay $5,000 for this guy and $2,000 for that guy. Well, the jury was entitled to consider that to be just confirming what the agreement was. That's correct, Judge. And there was an entrapment instruction given here? There was an entrapment instruction, Judge, but attached to that or married to that entrapment instruction was the government's private entrapment instruction, which was also given. So the jury was entitled to believe either that there was no entrapment or that they believed that there was entrapment, that the person who entrapped him was a private citizen and was in no way working with the police at the time that he had overborne my client's will. So in essence, Judge, it's a hybrid argument. It's an argument that says, yes, he had to be proven entrapped. That was the government's burden. The government had to prove that my client was not entrapped. But the minute that they also received an ancillary instruction, the instruction that said, you know, by the way, this person that you say had 20 John Doe warrants that he had been working with the police department had, in effect, been on hiatus for a while, and at the time that he convinced your client to do this deed, he was a private citizen. So there was the private citizen instruction. So, Judge, I'm not arguing that there was this promise in exchange for another promise in the future. I'm saying that that part of the statute that says for a promise or agreement to pay anything of pecuniary value or who conspires to do so. So, in other words, this is a promise of an amount that was floated out there by the government informant, and at no time in any of the tapes does my client say, okay, I will agree to pay 7,000. As the government points out in their brief, it's saying that my client said, okay, I'll pay up 5,000 right now, and then 2,000 for the next guy. But that was the words of the informant. The informant keeps talking about this, and just the same way that the informant collected $500 from my client, that conversation was never recorded. So we're relying, the jury at all times had to rely on the informant saying, yes, he was going to pay 7,500. 500 of it was to purchase a gun, which we already know that that exchange was not for the murder for hire. That exchange was for the purchase of a handgun. So that money was exchanged. And then this purported promise, and I would stand here without any argument whatsoever, if on the tapes it says, okay, I'm going to pay 5,000 for this guy, boom, and 2,000 for this guy, boom. And when you do that in the future, that's when you're going to get your money. That's all fine and good, but that is not in the record. What's in the record is the government informant, Mr. Valentin, repeatedly saying, okay, you're going to pay $7,000 and you're going to pay this. Well, that's the tape recordings, but there were antecedent discussions where your client approached the informant to do the deed or find somebody who would do the deed. And the jury evidently found Mr. Valentin credible and believed his testimony that, yes, he was approached by your client who wanted these witnesses murdered, and your client offered to pay him $7,500 for it. That's right, Judge. The jury was entitled to reach that conclusion. However, not when the burden is on the government to prove not only that he wasn't entrapped, but that Mr. Valentin was a private citizen, just somebody that's out there to do good for people, that he was doing it out of the goodness of his heart. And that's what the jury was entitled to believe. And I'm saying that that was insufficient as a matter of law because it was clearly Mr. Valentin had been a police informant for a long time. So the question is, was he giving something in exchange of pecuniary value? And I distinguish that from the Richeson case because in Richeson, the court said that it has to be something of pecuniary value, that there has to be some concrete thing. It could be drugs. It could be it runs a list of all the things that it could have been. But there's no mention in Richeson about the exchange for something of pecuniary value for the purchase of a handgun. My client was never charged with attempted to purchase an illegal handgun. He was charged with attempted murder and hiring an informant and the informant's friend. Well, he didn't know Mr. Valentin was previously an informant, did he? No, he did not. But he did know him from back in the days of the gangs and some other things, right? He knew him as a neighbor who had helped him land some jobs in his plumbing business, and he held himself out as a plumber. And then lo and behold, at one of his meetings, he gratuitously threw out there that he himself was a gangbanger, that he, meaning Valentin, had been a gangbanger to suggest that my client should have known that he was a gangbanger and that he had access to hiring people for murder for hire. So he hired him just because he was a helpful neighbor? Yes. That's interesting. Yes. In fact, Mr. Valentin denied throughout this entire trial that he was close, that he went over to the neighbor's house to eat and that he didn't know the children that well. But you're right, Judge, the jury found out that he could have been a private citizen and used that to determine that my client was guilty. So we're saying that offering money in exchange for a gun is not the proper consideration. Thank you. Thank you. Mr. Salib. May it please the Court, my name is Peter Salib, and I represent the United States. This case isn't just about money for a gun, is it? No, it is not, Judge. It is about a defendant trying to murder two state witnesses against, who were scheduled to testify against his son in state court for murder, for the murder, an attempted murder of another individual. Your Honor, the defendant's position about the sufficiency is not clearly laid out, and the elements clearly here were met with overwhelming evidence. Your Honor, the defendant acted with clear intent to have Mr. Rios and Mr. Sierra murdered, and he promised to pay either Mr. Valentin or a hitman for those murders. And as Your Honor stated, that promise is what's sufficient under the statute, the promise to pay. The evidence here, Your Honor, was overwhelming at trial, and that included, number one, the recordings of the defendant, most critically the last recording on October 16th of the meeting in which the undercover officer posing as the hitman was introduced. That recording went for over 20 minutes, and there were repeated statements by the defendant to pay for the murders once they were completed. In fact, on page 7 and 8 of the transcript, Mr. Caguana, the defendant, said right now is $5,000, and then he follows it and says, yeah, get the $2,000, meaning $5,000 and $7,000. Those are the defendant's words, not Mr. Valentin's words. Additionally, Your Honor, the photos that were presented of both Rios and Sierra by the defendant to Mr. Valentin, showing him what those individuals looked like. The surveillance notes that the defendant took regarding the movements, which were done a month and a half prior to these meetings in October. The money paid for the gun, in addition to the testimony of both Valentin and the undercover. And lastly, Your Honor, the defendant ultimately got on the stand and lied about what occurred during those few days. And the jury made that credibility determination with all of that in front of it. And that jury was instructed properly, both on entrapment, private entrapment, inducement, predisposition, and all the things the government had to prove beyond a reasonable doubt. And the jury made that finding, and there is no basis in law for this court to overturn that finding with the overwhelming evidence that was presented. I assume all of this was – the negotiations were taking place while his son was on pretrial detaining before his murder trial? Yes, Your Honor. He was actually – the son was in custody in Cook County awaiting murder trial, yes. So the defendant's belief was that in October, that the trial was supposed to start on October 23rd. The defendant told Mr. Valentin that witnesses needed to be killed by the 19th so that they would not be available to testify at the trial. Ultimately, the case would have had to have been dismissed. And before – I'm sorry. No, I was just going to say that it was very close to what the trial was scheduled. Is that correct? That is correct, Your Honor. Okay. And was it ultimately – was he ultimately tried or did he plead? It's just out of curiosity. Your Honor, actually, I don't know the answer as I stand here. But at the time of the incident and ultimately even at the time of this trial, that trial in state court was still pending. So it had not taken place yet. And the evidence also shows that even before he – the defendant solicited Valentin to carry out this hit, he himself was – Yes, Your Honor. That was corroborated by the notes, the surveillance notes that the defendant had taken in his own handwriting, which he admitted to on the stand in about August of 2013. Again, a month and a half or two before. Additionally, the defendant sought out Mr. Rios in person and was – met him at a McDonald's, was standing outside of his front window looking at him and ultimately when he did meet him said, you need to go talk to my son's lawyer and essentially recant your statement, your anticipated testimony. That took place in March of 2013, almost seven months prior to the activities in this case. If there are no further questions, Your Honors, we would ask that this court affirm the conviction and sentence of the defendant. Thank you. Thank you. Mr. Gutierrez, anything further? Nothing further, Your Honor. All right, thank you. Our thanks to all counsel. The case is taken under advisement and the court will stand in recess. Thank you.